UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

TONYA GRAHAM,                    )
                                 )
          Plaintiff,             )
                                 )
     vs.                         )          Case No. 4:14-CV-419 (CEJ)
                                 )
HUBBS MACHINE AND                )
MANUFACTURING, INC., et al.,     )
                                 )
          Defendants.            )

## MEMORANDUM AND ORDER

This matter is before the Court on defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56(a). Plaintiff has responded in opposition, and the issues are fully briefed.

### I.     Background

Plaintiff Tonya Graham was employed by defendant Hubbs Machine and Manufacturing, Inc. from February 1996 until her termination in July 2013. From July 2008 until her termination, Graham served as vice president of the company. In the second amended complaint, Graham asserts a claim against Hubbs Machine for wrongful termination in violation of Missouri public policy (Count I)[1] and a claim against defendants Hubbs Machine, Rick Benward, and William Hubbs for retaliation under section 510 of Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1140 (Count III). Plaintiff alleges that she was terminated for reporting

---

[1] To the extent that plaintiff's state law claim of wrongful termination in Count I relied upon the alleged violations of ERISA she reported, the Court found that claim to be expressly and completely preempted by ERISA. 29 U.S.C. §§ 1132, 1144; [Doc. #51]. The Court also previously found that plaintiff failed to plead sufficient facts demonstrating that Hubbs Machine violated the Missouri statutes and regulations cited as a basis for her wrongful termination claim. [Doc. #52]. The sole remaining basis of public policy for plaintiff's wrongful termination claim in Count I, thus, is the alleged violations of FINRA.

to her supervisor another employee's violations of the Financial Industry Regulation Authority (FINRA) rules, ethical codes and regulations governing conflicts of interest, and ERISA, including 29 U.S.C. § 1106.

## II.  Legal Standard

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered if the moving party shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In ruling on a motion for summary judgment, the court is required to view the facts in the light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences to be drawn from the underlying facts.  AgriStor Leasing v. Farrow, 826 F.2d 732, 734 (8th Cir. 1987).  The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).  If the moving party meets its burden, the non-moving party may not rest on the allegations of its pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists.  Gannon Intern., Ltd. v. Blocker, 684 F.3d 785, 792 (8th Cir. 2012); Gibson v. Am. Greetings Corp., 670 F.3d 844, 853 (8th Cir. 2012).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita Elec. Indus. Co.., 475 U.S. at 587).

## III.  Discussion

### A.  Uncontroverted Facts

The following facts are undisputed in the record. Hubbs Machine and Manufacturing, Inc. is owned by defendant William (Bill) Hubbs. Hubbs Machine manufactures optical targeting for close tolerance noncontact survey systems, which allow for measurements on aircraft tooling. Hubbs Dep. at 22:4–23:6 [Doc. #104-3]. Hubbs Machine hired Graham in February 1996 to answer phones and perform a variety of tasks. Graham Dep. at 15:21–16:7 [Doc. #104-1]. In 2004, Graham became the office manager of Hubbs Machine. In 2008, Graham was named the vice president of Hubbs Machine. Graham Dep. at 73:4–12 [Doc. #104-1]. She held this position until her discharge on July 31, 2013. Graham Dep. at 17:8–16 [Doc. #104-1].

In total, Graham worked at Hubbs Machine for over 17 years. Hubbs Dep. at 92:20–21 [Doc. #104-4]; Graham Dep. at 82:18–21 [Doc. #104-1]. As vice president of the company, Graham handled the administrative side of the business, including purchase orders and financial records. Hubbs Dep. at 73:2–9, 74:17–76:11 [Doc. #104-3]. She also managed employees, read corporate contracts, negotiated sales, and did accounting work. Graham Dep. at 17:20–18:10 [Doc. #104-1]. Hubbs handled the mechanical or technical side of the business. Hubbs Dep. at 75:3–15 [Doc. #104-3].

### 1.    Graham's Emails from Her Work Account

During her tenure with Hubbs Machine, plaintiff divulged personal information about Hubbs and personal conversations or disputes between herself and Hubbs, using her company email account during work hours. Defs.' Ex. 6 [Doc. #104-7]; Graham Dep. at 102:18–114:14 [Doc. #104-1]. Hubbs became aware of these emails on June 8, 2013. Hubbs Dep. at 11:11–12:2 [Doc. #104-6]. For example,

on July 3, 2012, Graham sent an email to Deb Abbot, the wife of a customer of Hubbs Machine, which divulged specifics of Hubbs's relationship with his girlfriend, Mary. Defs.' Ex. 6 at 2–4 [Doc. #104-7]. On July 9, 2012, Graham sent an email to Abbot, in which she called Hubbs a "fucking idiot" because he informed her that he was engaged to be married. Defs.' Ex. 6 at 1 [Doc. #104-7]; Graham Dep. at 30:10–31:8 [Doc. #104-1]; Hubbs Dep. at 36:9–19 [Doc. #104-3].

Additionally, Graham sent emails to Hubbs Machine's distribution broker and customer, Guiseppe Ganci, divulging and discussing Hubbs's personal matters and conversations between herself and Hubbs. Defs.' Ex. 6 [Doc. #104-7]. For example, on July 16, 2012, Graham sent Ganci an email divulging information regarding Hubbs's personal relationship and Graham's personal feelings about Hubbs's fiancée. Defs.' Ex. 6 at 7 [Doc. #104-7] ("Yep engaged. He will never learn. No…she is not coming for I cannot stand her and have told him that I will not being having relations with her. PERIOD!!!"). On February 28, 2013, Graham divulged to Ganci a "heated conversation" between herself and Hubbs. Defs.' Ex. 1 at 18 [Doc. #104-2]. On October 16, 2012, Grahams sent Ganci an email in which she referred to Hubbs's fiancée as "stupid." Defs.' Ex. 6 at 9 [Doc. #104-7]. On March 21, 2013, Graham sent Ganci an email again divulging details of her personal disputes with and feelings toward Hubbs. Defs.' Ex. 6 at 28 [Doc. #104-7] ("I wish . . . that the customers and business had not become SO much mine (within my heart and soul) for I would walk away. I do not feel as though anyone, especially one that has the energy to inflict so much disrespect and ignorance on me, deserves my over dedication."). On May 29, 2013, Graham sent an email to Ganci

stating, "Catch my hint . . . I know a REALLY BIG ASSHOLE!" Defs.' Ex. 6 at 55 [Doc. #104-7].

Graham also divulged information regarding her personal dispute with Hubbs to one of Hubbs Machine's largest customers, Hexagon. See Defs.' Ex. 6 at 25 [Doc. #104-7] (a March 14, 2013 email Graham sent to a Hexagon salesman, Lee Steinbecker, stating: "Things have been quite rough around here. Bill and I have gotten into a pretty full blown knockout. He has decided that since I do not care for his wife, I am OUT! He has said some pretty hurtful things and as I try to reel myself in, I can't help but wonder WHY I have dedicated myself to someone and thing that could care less if I was here tomorrow.").

Graham also divulged her personal dispute with Hubbs in multiple emails to Michele O'Donnell, an employee of Boeing—Hubbs Machine's largest customer. See Defs.' Ex. 6 at 39 [Doc. #104-7] (an April 15, 2013 email in which Graham stated that because of events that occurred at Hubbs Machine, she may be looking for a different job); Defs.' Ex. 6 at 42 [Doc. #104-7] ("After 17 years of giving my LIFE . . . I am a doormat to him and his new wife. I have served my purpose, made him MILLIONS, and now I mean NOTHING! I am leaving and will be taking the rest of the week of[f]!"); Defs.' Ex. 6 at 68 [Doc. #104-7] (a June 26, 2013 email in which Graham wrote: "This is just a hiccup in my journey. I will come out on top & stronger . . . I just have to play my cards right!").

Also on April 15, 2013, Graham wrote an email to another Boeing employee, Brian Campbell, stating that there had been "some major turning of events within Hubbs Machine and I may be looking for a different job." Defs.' Ex. 6 at 41 [Doc. #104-7]. On April 19, 2013, Graham wrote an email to Joel Martin of Hexagon

Metrology, a customer of Hubbs Machine, stating that she was "often too scared to allow Bill one on one time, for he often can speak about things, that I then need to clean up." Defs.' Ex. 6 at 48 [Doc. #104-7]. On July 9, 2013, Graham sent an email to John Visser of Boeing, stating "[l]ots of changes happening to our little company!—It's a wait and see thing around here. It's funny how 18(+) years of over dedication gets you thrown into a bonfire with no explanations and/or answers!" Defs.' Ex. 6 at 71 [Doc. #104-7].

On July 8, 2013, Graham sent an email to Maryse Leveille of Hexagon Metrology, in which she wrote, "I have grown a company, that I have no stake or interest in, to be a VERY successful business. However, the owner has now tak[en] advantage of my over dedication, to stick daggers in my back every time I turn around." Defs.' Ex. 6 at 76 [Doc. #104-7]. On July 9, 2013, Graham sent an email to Linaka Robins of Boeing Optical Services, a unit of Boeing and customer of Hubbs Machine, stating, "it just does not seem worth it to get up in the mornings to come in to make someone SO much more money than the RESPECT he gives me in return." Defs.' Ex. 6 at 74 [Doc. #104-7].

It is undisputed that Graham also divulged confidential personnel matters and called the hiring of defendant Rick Benward as president of Hubbs Machine into question with customers. Pl.'s Resp. ¶ 22 [Doc. #110]. On June 17, 2013, in an email to Darelee Phillips of Boeing, Graham divulged that Hubbs Machine had hired Benward as president and wrote that Benward had "NO knowledge of the industry, company, or company protocol." Defs.' Ex. 6 at 63 [Doc. #104-7]. On June 24, 2013, in an email to Pam Brown, an employee of Geodetic Systems, Inc., a customer of Hubbs Machine, Graham divulged that Hubbs Machine had hired

Benward as president and Benward had "pulled the wool over Bill's eyes." Defs.' Ex. 6 at 66 [Doc. #104-7]. On July 10, 2013, Graham sent an email to Cornel Ecaucion of Automated Precision, Inc., in which she stated, "We have now hired a 'president' for Hubbs Machine that has NO knowledge of our business/industry and is going to help me get things in a 'controlled' order. Maybe this is just the first step of truly trying to push me out . . . ." Defs.' Ex. 6 at 79 [Doc. #104-7].

### 2. Benward's Transition from New York Life to Hubbs Machine

Benward was a registered representative with New York Life in Springfield, Missouri, from 2006 to June 17, 2013. Benward Dep. at 15:21–16:5 [Doc. #104-4]. As a captive agent for New York Life, Benward represented and sold securities and insurance products that New York Life offered. Benward Dep. at 17:5–20:11 [Doc. #104-4]. Around 2007, Benward approached Hubbs about working in the sales and marketing arena at Hubbs Machine with Graham and her husband as a three-person team, but Hubbs chose to not move in that direction. Benward Dep. at 20:23–21:20 [Doc. #104-4]. Around 2008, Benward sold Hubbs some life insurance and investment products. Benward Dep. at 17:11–19:23 [Doc. #104-4]. In 2009, Hubbs Machine moved their profit sharing account to New York Life, for which Benward received an initial commission. Benward Dep. at 42:12–22 [Doc. #104-5]. In or around 2010, Benward became the New York Life representative overseeing Hubbs Machine's profit sharing plan. Benward Dep. at 19:11–20:7 [Doc. #104-4].

Hubbs approached Benward regarding possible employment at Hubbs Machine in 2013, citing the deteriorating relationship between himself and Graham and the corporate structural weaknesses within Hubbs Machine. Benward Dep. at

20:21–22:19 [Doc. #104-4]; Hubbs Dep. at 18:17–25 [Doc. #104-6].   Around April 25, 2013, Benward contacted Todd Siler, New York Life's senior agency standards consultant, inquiring as to the possibility of providing consulting services to Hubbs Machine while he retained his position as a licensed agent with New York Life.   Defs.' Ex. 7 at ¶¶ 3–5 [Doc. #104-8]; Benward Dep. at 52:24–54:2 [Doc. #104-4]; Benward Dep. at 12:18–22 [Doc. #104-5].   Based on his understanding of applicable industry standards, FINRA regulations, and New York Life's policy, Siler informed Benward that he could not maintain his contract with New York Life while acting as a consultant for Hubbs Machine.   Defs.' Ex. 7 at ¶¶ 6–7 [Doc. #104-8]; Benward Dep. at 53:22–54:4 [Doc. #104-4]; Benward Dep. at 12:18–13:17 [Doc. #104-5].   Specifically, Siler told Benward he could not receive compensation from New York Life and Hubbs Machine at the same time.   Defs.' Ex. 7 at ¶ 8 [Doc. #104-8].

On May 5, 2013, Benward and Hubbs negotiated and agreed to an offer of terms and conditions of Benward's employment with Hubbs Machine.   Benward Dep. at 49:16–50:18 [Doc. #104-4].   On May 6, 2013, Benward began preparing his agent succession plan for the placement of his New York Life customers. Benward Dep. at 13:22–14:11 [Doc. #104-5]; Pl.'s Resp. ¶ 38 [Doc. #110].   In Benward's agent succession plan, he identified seven New York Life successor representatives for his seven hundred clients.   The plan was prepared online in a software program that required each New York Life representative to approve the assignment of the client.   Benward Dep. at 15:5–22 [Doc. #104-5]; Defs.' Ex. 8 [Doc. #104-9].

During the week of May 13, 2013, Benward notified New York Life senior partner Don Angell, managing partner of New York Life in Overland Park, Kansas, Troy Braswell, and Siler of his intent to leave New York Life to become the president of Hubbs Machine.  Benward Dep. at 14:18–15:4 [Doc. #104-5]; Defs.' Ex. 7 at ¶ 9 [Doc. #104-8]; Pl.'s Resp. at ¶ 40 [Doc. #110].  On May 23, 2013, Benward submitted his agent succession plan to New York Life so it could be approved by each of the seven assigned agents, Braswell, and New York Life's home office in New York City.  Benward Dep. at 16:16–17:9 [Doc. #104-5].  On May 26 and 27, 2013, New York Life representatives approved their respective designation or assignment as successor agents to service Benward's clients.  Defs.' Ex. 8 at 3 [Doc. #104-9].  On May 31, 2013, Braswell approved Benward's agent succession plan, but the New York Life home office had not yet granted final approval.  Defs.' Ex. 8 at 3 [Doc. #104-9]; Benward Dep. at 17:1–9 [Doc. #104-5].

Benward's official hire date with Hubbs Machine was June 10, 2013.  Benward Dep. at 43:4–6 [Doc. #104-4].  That day, Benward was introduced to Hubbs Machine employees as the president of Hubbs Machine.  Graham Dep. at 125:24–126:4, 150:11–15 [Doc. #104-1]; Pl.'s Resp. at ¶ 44[Doc. #110].  After the meeting, Graham contacted Mike Mormino at New York Life and asked if there had been a rep change for Hubbs Machine's New York Life account.  Mormino told Graham there had not and instructed her to call compliance.  Graham Dep. at 89:25–90:16, 125:24–126:9, 156:1–157:2 [Doc. #104-1].  Graham called New York Life's compliance department in Kansas City that same day.  They also stated they had not heard of any rep change.  Graham Dep. at 93:4–21, 126:10–11 [Doc. #104-1].

During Benward's first week of employment at Hubbs Machine, Graham first mentioned to Benward that she believed there was a conflict of interest between Benward's employment with New York Life and Hubbs Machine. Graham Dep. at 133:9–22, 152:17–153:10 [Doc. #104-1]; Benward Dep. at 62:23–63:1 [Doc. #104-4]; Benward Dep. at 17:10–18:18 [Doc. #104-5]. In this confrontation with Benward, Graham asked him if he had all his "ducks in a row" with respect to his former employment with New York Life. Graham Dep. at 133:9–134:14, 153:11–17 [Doc. #104-1]. Benward replied that he was not conducting any business for New York Life and was waiting for the New York Life home office's final approval of his agent succession plan. Benward Dep. at 18:19–19:1 [Doc. #104-5]; Graham Dep. at 153:11–154:21 [Doc. #104-1].

Between June 11 and 17, Graham made several calls to New York Life representatives to inquire about New York Life's requirements. Graham Dep. at 96:6–16, 97:9–19, 156:23–160:2 [Doc. #104-1]. Graham asked New York Life representatives about the propriety of the manager of her company's 401K retirement plan becoming the president of that company. Graham Dep. at 95:5–11, 160:3–14 [Doc. #104-1]. Graham did not provide Benward's name or any additional information during her inquiries. Graham Dep. at 95:12–20, 160:15–19 [Doc. #104-1]. A New York Life compliance department employee in New York City told Graham that her described scenario constituted dual employment and would be unethical under to their employee code. Graham Dep. at 94:5–18, 98:1–9, 127:10–19 [Doc. #104-1]. When the New York Life representatives asked her whether she wanted to make a complaint, Graham stated that she did not want to open a case. Graham Dep. at 94:17–18, 160:15–19 [Doc. #104-1]. Graham

never filed a formal complaint with New York Life or FINRA.  Graham Dep. at 224:24–225:3, 226:1–2 [Doc. #104-1].  Graham also did not file any official complaints with the Missouri Insurance Board, the Securities and Exchange Commission, NASDAQ, or any office associated with ERISA.  Graham Dep. at 224:24–225:20 [Doc. #104-1].

After speaking to New York Life representatives, Graham went back to Benward and informed him that she had called New York Life in New York City and they did not know about his transition to Hubbs Machine.  On June 17, 2013, Benward informed Graham that she had spoken with the wrong people and suggested she contact the New York Life office in Kansas City, Missouri.  Graham Dep. at 139:3–20 [Doc. #104-1]; Benward Dep. at 19:2–20:5 [Doc. #104-5]. Benward provided Graham with the names and phone numbers of three New York Life management representatives he consulted regarding his transition—Siler, Angell, and Braswell.  Benward Dep. at 24:14–24 [Doc. #104-5].  Graham did not contact any of the names Benward provided because she thought he "had already sold his song to them" and she had her "contacts."  Graham Dep. at 128:16–21, 140:14–142:43, 149:15–150:9, 155:7–24 [Doc. #104-1]; Defs.' Ex. 1 at 20 [Doc. #104-2]; Benward Dep. at 19:2–20:5 [Doc. #104-5].

Graham also informed Hubbs that she had contacted New York Life and they did not have knowledge of Benward's transition to Hubbs Machine.  Hubbs Dep. at 112:23–115:23 [Doc. #104-3].  Hubbs told Graham that he was satisfied with Benward's actions and that he did not believe anything was done incorrectly. Hubbs Dep. at 117:21–118:19 [Doc. #104-3].  Hubbs became irritated by Graham's repeated complaints of Benward and her refusal to contact supervisors to

whom Benward directly reported at New York Life.  Hubbs Dep. at 118:10–19 [Doc. #104-3]; <u>see also</u> Graham Dep. at 126:23–127:4 [Doc. #104-1] (testifying that she told Hubbs "there could be some concern as to Benward's dual roles" and there "might be some violation of some rules and federal requirements" and Hubbs responded "don't fucking pay him then").

On June 17, 2013, Benward contacted his direct chain of command at New York Life and was instructed to submit his resignation.  That same day, Benward submitted his resignation to New York Life.  Graham Dep. at 139:3–20 [Doc. #104-1]; Benward Dep. at 20:8–11 [Doc. #104-4]; Defs.' Ex. 10 [Doc. #104-11].  On June 18, 2013, Braswell officially accepted Benward's resignation.  Benward Dep. at 20:16–21 [Doc. #104-5]; Defs.' Ex. 9 [Doc. #104-10].  Upon resignation from New York Life, Benward automatically resigned his registered representative status with FINRA.  Benward Dep. at 89:17–90:5 [Doc. #104-4].

On October 11, 2013, Gloriann Marchio, a director at New York Life, contacted Hubbs via a letter.  Marchio contacted Hubbs because Benward's employment with Hubbs Machine and his role as a New York Life representative potentially raised issues under ERISA and the rules promulgated by the Department of Labor.  Pl.'s Ex. 18 [Doc. #110-23]; Hubbs Dep. 128:22–130:23 [Doc. #104-3].  New York Life determined that there was a brief period after Benward became employed by Hubbs Machine where Benward "may have" received compensation in connection with the sale of securities to Hubbs Machine's profit sharing plan.  Pl.'s Ex. 39 [Doc. #110-44].  Thus, "to avoid any possible inference of impropriety," New York Life refunded Hubbs Machine $954.13, which represented the compensation paid to New York Life Securities LLC and the commission paid to

Benward as a New York Life agent between May and June 2013.  Pl.'s Ex. 39 [Doc. #110-44].

### 3. Benward's Requests for Customer Information and Passwords

On June 11, 2013, Benward asked Graham for all passwords and other customer information.  Benward made this request so Graham was not the only person in possession of all of Hubbs Machine's customer information, banking information, employee policies and procedures, job descriptions, audits and other company and customer information.  Graham Dep. at 127:4–8, 130:7–10 [Doc. #104-1]; Benward Dep. at 76:9–19 [Doc. #104-4]; Defs.' Ex. 1 at 27 [Doc. #104-2].  In an email response that same day, Graham provided some of the requested passwords and customer information off the top of her head, even though she kept a written record of passwords with written instructions on how to log in to particular programs or accounts.  Graham Dep. at 184:4–12, 212:18–213:10 [Doc. #104-1].  Graham provided additional passwords two days later.  Graham Dep. at 213:8–17 [Doc. #104-1].  She provided two other passwords on June 18 or 19, 2013.  Graham Dep. at 130:9–15, 184:4–12 [Doc. #104-1]; Benward Dep. at 76:17–77:5 [Doc. #104-4]; Benward Dep. at 52:14–54:18 [Doc. #104-5]; Defs.' Ex. 1 at 28–29 [Doc. #104-2].  Some of the passwords Graham provided were inoperative or were the same passwords Graham had previously provided to Benward.  Graham Dep. at 130:16–21 [Doc. #104-1]; Benward Dep. at 76:17–25 [Doc. #104-4]; Benward Dep. at 52:20–53:21 [Doc. #104-5].

In a letter dated July 29, 2013, Benward again requested that Graham provide him all information related to ID's and passwords connected to the conduct of Hubbs Machine.  Graham Dep. at 193:18–194:11 [Doc. #104-1].  Benward also

requested that Graham provide all information required for order processing with all buying groups and that Graham identify all accounts requiring security screenings and the process for submitting applications. Defs.' Ex. 1 at 36 [Doc. #104-2]. Benward asked Graham for a complete response to his request for information numerous times. Benward Dep. at 76:2–12 [Doc. #104-4]. After her termination, Graham provided four ID's and passwords, two of which were repeats and one of which was obsolete. Defs.' Ex. 1 at 31 [Doc. #104-2]; Hubbs Dep. at 102:3–12 [Doc. #104-6].

### 4.    July 2013 Industry Conference in San Diego

In July 2013, Benward, Graham, and Hubbs attended an industry conference in San Diego, representing Hubbs Machine. See Hubbs Dep. at 59:13–19 [Doc. #104-3] (referred to in the record as "CMSC," the Coordinate Metrology Systems Conference). Hubbs brought Benward to the conference to introduce him to the business. Graham Dep. at 191:13–19 [Doc. #104-1]. Hubbs and Benward expected Graham to introduce Benward to Hubbs Machine's customers as her superior, but she ignored him and refused to introduce him. Hubbs Dep. at 132:9–16, 134:6–135:16 [Doc. #104-3]; Benward Dep. at 69:1–11 [Doc. #104-4]. Benward instead introduced himself to customers and handed out business cards. Graham Dep. at 191:13–192:17 [Doc. #104-1]; Hubbs Dep. at 132:9–16 [Doc. #104-3]; Benward Dep. at 68:7–18 [Doc. #104-4].

Benward discussed with Graham the importance of presenting a "united front" to the customer base at the conference. Defs.' Ex. 1 at 36 [Doc. #104-2]; Hubbs Dep. at 134:6–11 [Doc. #104-3]. According to Graham, Hubbs and Benward did not have many contacts to converse with at the conference and

blamed her for not introducing them to Hubbs Machine's customers.  Graham Dep. at 191:20–192:2 [Doc. #104-1] ("Rick and Bill, because Bill has been so detached, did not have many contacts to converse with, and then it was somehow my fault that they were going to come to the booth and belittle me and scream and yell at me that I did not parade them around and introduce them, that I went about the business of Hubbs Machine and talking to our customers about business.").

Hubbs and Benward testified that Graham became upset when Benward began introducing himself to customers, because she thought it was improper and confusing.  Hubbs Dep. at 132:5–16 [Doc. #104-3]; Benward Dep. at 68:13–18 [Doc. #104-4]; <u>see</u> Graham Dep. at 192:6–17 [Doc. #104-1] ("Nobody in the industry, and Bill knows this, wants a business card of someone they can't get an answer from. . . . So Rick Benward was handing his cards out . . . but didn't have an answer to nothing.  He had only been there two weeks.  He knew nothing about our facility but yet he's going to jump me about it at the booth.").  After returning from the conference, Benward sent Graham a letter dated July 29, 2013 that stated that Graham's conduct at the conference was disrespectful and unprofessional, and that the conference was the wrong time or place for "such a display of poor behavior."  Defs.' Ex. 1 at 36 [Doc. #104-2].  The letter noted that Graham had stated she would not recognize Benward's position as president of the company and that she considered him "dead weight" and a financial liability to Hubbs Machine.

### 5.  Graham's Termination

On July 30, 2013, Benward and Hubbs met with Graham in-person to discuss and obtain the requested information regarding Hubbs Machine's business.  During the meeting, Graham asked Benward a series of questions related to his credentials

to serve as president of Hubbs Machine. Benward Dep. at 71:22–72:25 [Doc. #104-4]; see Defs.' Ex. 1 at 51 [Doc. #104-2]. That same day, Hubbs issued Graham a letter requesting her to explain her "side of the story" with respect to the "disloyal, reckless, unprofessional, and at times malicious statements" Graham made to Hubbs Machine's customers regarding her relationship with Hubbs, Hubbs's personal relationships, and alleged disputes she had with Hubbs Machine. Defs.' Ex. 1 at 37 [Doc. #104-2]. The letter informed Graham that conversing with Hubbs Machine's customers about any discussions she had with Hubbs or other company employees was "inappropriate and a complete violation of the [c]ompany's reasonable standards and expectations." Defs.' Ex. 1 at 37 [Doc. #104-2]. The next day, Graham drafted a written response, stating that she considered many of Hubbs Machine's customers to be her personal friends with whom she shared stories of personal events and that "[t]hese types of relationships only benefit Hubbs Machine and its[] revenue." Defs.' Ex. 1 at 38 [Doc. #104-2]; Hubbs Dep. at 140:16–142:11 [Doc. #104-3]. Hubbs and Benward considered her response to be inadequate. Hubbs Dep. at 141:4–142:11 [Doc. #104-3]; Benward Dep. at 81:12–19 [Doc. #104-4].

On July 31, 2013, Graham's employment at Hubbs Machine was terminated. Her termination letter stated that she had refused to cooperate with Hubbs and Benward by failing to provide a written statement of her side of the story, referenced her behavior at the San Diego trade show, and noted that she had continually refused to provide all keys, access codes, passwords, and materials related to the business. Defs.' Ex. 1 at 39 [Doc. #104-2].

### B.    Retaliation in Violation of Section 510 of ERISA

Graham alleges that the defendants' termination of her employment was in retaliation for her complaints regarding Benward's unlawful activities in violation of ERISA section 510.  In relevant part to the allegations in the complaint, section 510 of ERISA makes it unlawful for an employer to discharge an employee "because [s]he has given information or has testified or is about to testify in any inquiry or proceeding relating to this chapter."  29 U.S.C. § 1140.  An ERISA-based retaliation claim can be established through direct evidence, or in the absence of direct evidence, through the McDonnell Douglas three-part burden-shifting framework common to Title VII cases.  Manning v. Am. Republic Ins. Co., 604 F.3d 1030, 1042 (8th Cir. 2010) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).

To establish a prima facie case of ERISA retaliation, plaintiff must prove: "(1) she participated in a statutorily protected activity; (2) an adverse employment action was taken against her; and (3) a causal connection existed between her participation in a statutorily protected activity and an adverse employment action." Manning, 604 F.3d at 1043.  If a claimant is able to establish a prima facie case of a section 510 violation, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action.  Id. at 1042.  If the employer meets its burden of production, "then the burden shifts back to the claimant to prove that the proffered reason is pretextual."  Id. at 1042.

Defendants contend that Graham cannot establish the first element of a prima facie case of retaliation, because she has not and cannot establish that an "inquiry or proceeding" was taking place within the meaning of section 510.  "It is an open issue in [the Eighth] Circuit whether § 510 protects informal complaints or protests relating to [actions] a participant reasonably believes to be illegal [under

ERISA]." Langlie v. Onan Corp., 192 F.3d 1137, 1141 (8th Cir. 1999); see Shrable

v. Eaton Corp., 695 F.3d 768, 771 (8th Cir. 2012) ("We have not decided whether

informal complaints are covered by § 510 of ERISA, but we need not reach that

issue here." (citing Langlie)).[2]  For purposes of the resolution of the instant motion

for summary judgment, the Court will assume, without deciding, that section 510 of

ERISA provides a claim for retaliation based on plaintiff's informal complaints and

protests.

Even assuming plaintiff has established a prima facie case under section 510

of ERISA, however, defendants have articulated legitimate nondiscriminatory

reasons for Graham's termination that she has failed to show were pretext for

interfering with her rights under ERISA.  First, Graham sent numerous emails from

her work account disparaging Hubbs and Benward on a personal and professional

level to clients of Hubbs Machine and third parties who had a business relationship

---

[2]  The courts of appeals in other circuits are divided on the issue.  Compare George v. Junior Achievement of Cent. Ind., Inc., 694 F.3d 812, 814–17 (7th Cir. 2012) (finding that section 510 of ERISA covers informal, unsolicited employee inquiries), Anderson v. Elec. Data Sys. Corp., 11 F.3d 1311, 1314–15 (5th Cir. 1994) (finding that plaintiff's claim involving unsolicited, informal complaints "falls squarely within the ambit of ERISA § 510"), and Hashimoto v. Bank of Hawaii, 999 F.2d 408, 411 (9th Cir. 1993) ("[Section 1140 of ERISA] is clearly meant to protect whistleblowers.  It may be fairly construed to protect a person in [plaintiff]'s position if, in fact, she was fired because she was protesting a violation of law in connection with an ERISA plan.  The normal first step in giving information or testifying in any way that might tempt an employer to discharge one would be to present the problem first to the responsible managers of the ERISA plan.  If one is then discharged for raising the problem, the process of giving information or testifying is interrupted at its start: the anticipatory discharge discourages the whistle blower before the whistle is blown."), with Sexton v. Panel Processing, Inc., 754 F.3d 332, 335–42 (6th Cir. 2014) (finding that § 1140 does not cover an employee's informal, unsolicited complaints and noting that "[i]n ERISA, of all statutes, we should hesitate to add a provision the statute does not contain (a clause protecting any employee who opposes allegedly unlawful practices) and to eliminate a limitation that the statute does contain ('in any inquiry or proceeding')"), Edwards v. A.H. Cornell & Son, Inc., 610 F.3d 217, 222–24 (3d Cir. 2010) ("The Secretary of Labor argues, in its brief as amicus curiae, that '[b]roadly and naturally construed, "any inquiry or proceeding" encompasses plan participants' complaints to management or plan officials about wrongdoing, and the process by which that information is considered, however informal.'  We disagree." (internal citation omitted)), and King v. Marriott Intern. Inc., 337 F.3d 421, 426–28 (4th Cir. 2003) ("[T]he use of the phrase 'testified or is about to testify' [] suggest[s] that the phrase 'inquir[ies] or proceeding[s]' referenced in section 510 is limited to the legal or administrative, or at least to something more formal than written or oral complaints made to a supervisor.").  See also Nicolaou v. Horizon Media, Inc., 402 F.3d 325, 328–29 (2d Cir. 2005) (finding that the "informal gathering of information" falls within the plain meaning of "inquiry" and is protected by Section 510, as long as the employee's complaint was made in response to a "request for information").

with Hubbs Machine. She also failed to cooperate fully in providing Benward with information he requested on more than one occasion concerning passwords and customer information. Furthermore, at an industry conference in July 2013, Graham acted disrespectful to Hubbs and Benward in front of customers and other third parties in attendance. Finally, before terminating her employment, Hubbs gave Graham the opportunity to provide an explanation for her conduct, but her response did not address all of the issues raised. Undisputed facts in the record support each of these proffered reasons for plaintiff's termination.

Graham has not set forth affirmative evidence disputing that she sent inappropriate and embarrassing emails about Hubbs to company customers, that she failed to fully provide all of the passwords and account information Benward requested, or that she refused to introduce Benward at an industry conference. Instead, she simply claimed to Hubbs that many of the customer contacts she emailed were her friends with whom she shared stories of personal events to the benefit of Hubbs Machine. Graham also points to evidence in the record of the company's profit success at the time of her termination and the "global outcry" from clients after her termination. These assertions are simply an attempt to minimize the importance of defendants' justifications for terminating her and attack the defendants' business judgment, rather than demonstrating pretext. Graham's difference of opinion as to the seriousness of her attitude and conduct does not create a genuine issue of material fact regarding pretext. See Ostertag v. Historic Theater Grp., Ltd., No. 99-2737, 2000 WL 726490, at *1–2 (8th Cir. June 7, 2000) (finding that plaintiff's assertion that he rendered excellent services and his occasional temperamental episodes should not disqualify him from employment

"relates to a business judgment—which is the prerogative of the employer to make"—and did not provide sufficient evidence to refute the validity of the defendant's proffered reason for the adverse employment action).

Moreover, the "core question in a retaliation case does not, ultimately, concern the veracity of the facts underlying an employer's legitimate non-discriminatory reason for discharging its employee, but rather concerns whether 'the employment decision was based upon intentional discrimination.'" Stuart v. Gen. Motors Corp., 217 F.3d 621, 637 (8th Cir. 2000) (quoting Ryther v. KARE 11, 108 F.3d 832, 837–38 (8th Cir. 1997)). "The wisdom of a company's decision to terminate its employee for what [a court] may regard as a frivolous reason is not an issue in a [retaliation] case." Id. Instead, the court's "inquiry is limited to whether the employer gave an honest explanation of its behavior." Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 960 (8th Cir. 1995). The Court finds that defendants did so. Defendants thus are entitled to summary judgment on plaintiff's claim of retaliation under ERISA, because she failed to present evidence to support a finding that the defendants' proffered reasons for her termination were pretextual.

### C.    Remaining State Law Claim

The only claim that remains is Graham's state law-based claim of wrongful termination in violation of public policy. "A federal district court has discretionary power to decline the exercise of supplemental jurisdiction where the court has 'dismissed all claims over which it has original jurisdiction.'" Wilson v. Miller, No. 15-1415, 2016 WL 1621952, at *6 (8th Cir. Apr. 25, 2016) (quoting 28 U.S.C. § 1367(c)(3)). The factors a court should consider in deciding whether to exercise jurisdiction over pendent state law claims are "judicial economy, convenience,

fairness, and comity." <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 350 (1988). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." <u>Id.</u> at 350 n.7; <u>see also</u> <u>id.</u> (stating that the factors to be considered under the pendent jurisdiction doctrine "usually will favor a decision to relinquish jurisdiction when 'state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or the comprehensiveness of the remedy sought'" (quoting <u>United Mine Workers of Am. v. Gibbs</u>, 383 U.S. 715, 726 (1966))). When declining to exercise supplemental jurisdiction under § 1367(c), the court can decide to dismiss the remaining claims without prejudice or remand those claims to state court. <u>Lindsey v. Dillard's, Inc.</u>, 306 F.3d 596, 599 (8th Cir. 2002); <u>St. John v. Int'l Ass'n of Machinists & Aerospace Workers</u>, 139 F.3d 1214, 1217 (8th Cir. 1998).

This case was initiated in a state court, and resolution of the remaining claim depends solely on interpretation of state law and public policy. The Court declines to exercise supplemental jurisdiction over plaintiff's pendent state law claim and will exercise its discretion to remand the case to the state court.

*     *     *     *     *

For the reasons set forth above,

**IT IS HEREBY ORDERED** that defendants' motion for summary judgment [Doc. #103] is **granted** as to plaintiff's claim of retaliation under section 510 of ERISA in Count III.

**IT IS FURTHER ORDERED** that the Clerk of Court shall remand the this action to the Twenty-Third Judicial Circuit Court of Missouri (Jefferson County), from which it was removed.

A separate Judgment in accordance with this Memorandum and Order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 19th day of May, 2016.